IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 20-cv-03645-CMA-STV

TTEC HOLDING, INC.

    Plaintiff,

v.

MAURICE DA SILVA,

    Defendant.

## ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER

This matter is before the Court on Plaintiff TTEC Holdings, Inc.'s ("TTEC" or "Plaintiff") Motion for Temporary Restraining Order. (Doc. # 2.) The Court has determined that a hearing would not materially assist in its determination of the Motion. For the following reasons, the Motion is denied.

### I.    BACKGROUND

TTEC is a Colorado-based business process outsourcing ("BPO") company that provides its clients with strategy consulting, technologies, and services for customer experience management. (Doc. # 1-1 at 4.) Through its subsidiary TTEC Digital, TTEC provides cloud contact center solutions.

Defendant Maurice Da Silva ("Da Silva" or "Defendant") began working for TTEC as an Executive Director in sales in July 2011. (*Id.*) He was later promoted to Vice President of Sales, and then to Vice President of Sales Leadership. Plaintiff alleges that

Da Silva managed a staff of fifteen direct and indirect reports and was in charge of key aspects of TTEC Digital's business, including the expansion of TTEC's cloud contact center solution offerings to existing and prospective clients, directly and through strategic partners. (*Id.* at 5.)

Between 2015 and 2020, Da Silva and TTEC entered into six separate restricted stock unit agreements ("RSU Agreements"). (*Id.* at 5–6.) Under each agreement, TTEC granted Da Silva restricted stock units ("RSUs") that would vest over a period of several years, in exchange for Da Silva agreeing to certain restrictive covenants, including a non-compete provision. *See, e.g.*, (*id.* at 13, ¶ 3; 15, ¶ 8). The non-compete provisions in the RSU Agreements are identical. Each non-compete provision provides that for a period of twelve months after Da Silva's employment with TTEC, he may not

> [w]ork or otherwise contribute his/her knowledge, directly or indirectly, in whole or in part, as an employee, officer, owner, manager, advisor, consultant, agent, partner, director, significant shareholder (i.e., a shareholder holding more than 5% of outstanding equity in any such entity), volunteer, intern or in any similar capacity anywhere in the world to a business entity engaged in the same or substantially similar business in the full life cycle of customer strategy, analytics-driven, technology-enabled customer engagement management solutions from customer engagement strategy consulting, to technology and analytics driven customer acquisition to technology solution development and integration to business process outsourcing customer care (collectively, "TeleTech Business").

(*Id.* at 15, ¶ 8.1(a).) The non-compete provision is limited to "the territory where [Da Silva] perform[ed] services for TTEC[,]" including "the entire territory where [TTEC] benefits and is reasonable to expect to benefit from [Da Silva's] services." (*Id.*)

On September 3, 2020, Da Silva sent a letter resigning his employment with TTEC. (*Id.* at 9.) TTEC subsequently learned that Da Silva had been hired to work as

2

Vice President of Strategic Partner Development for Five9, Inc. ("Five9"). (*Id.*) TTEC alleges that Five9 is a BPO company like TTEC. Da Silva responds that Five9 is not a BPO because it does not staff contact centers. Da Silva characterizes Five9 instead as a software manufacturer and an authorized local telephone carrier that focuses solely on selling its own cloud platform technology and providing telecommunications services. (Doc. # 12 at 5) (citing (Doc. # 12-1 at 3–4)). The parties dispute whether TTEC and Five9 are in competition.

TTEC asked Da Silva to resign his employment with Five9 and sent cease-and-desist letters to Da Silva and to Five9 on the basis that Da Silva's employment at Five9 allegedly violates his non-compete agreements with TTEC. (Doc. # 1-1 at 10.) Da Silva has refused to resign his employment with Five9. (*Id.*)

TTEC initiated the instant suit against Da Silva in Denver District Court on November 30, 2020. Plaintiff filed the instant Motion for Temporary Restraining Order contemporaneously with its Complaint. (Doc. # 1-2.) Defendant removed the case to this Court on December 11, 2020. Defendant's Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order followed. (Doc. # 12.)

## II. LEGAL STANDARDS

Injunctive relief is an extraordinary remedy that should be granted only when the moving party clearly and unequivocally demonstrates its necessity. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). A party seeking a preliminary injunction or temporary restraining order must show (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is

denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction, or, put differently, that the balance of equities tips in the movant's favor; and (4) the injunction would not be adverse to the public interest. *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *Kaplan v. Bank of N.Y. Mellon Trust Co.*, No. 10-cv-02802-PAB, 2010 WL 4775725, at *1 (D. Colo. 2010) (citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980)) (noting that the four elements apply to both preliminary injunctions and temporary restraining orders and that "the same considerations apply" to both forms of injunctive relief). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

### III.  DISCUSSION

The Court finds that Plaintiff has not carried its heavy burden to clearly and unequivocally demonstrate the necessity of a temporary restraining order in this case and, therefore, its Motion must be denied.

**1.  PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM**

The Tenth Circuit has held that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" and that "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc.*, 356 F.3d at 1260 (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903

F.2d 904, 907 (2d Cir. 1990)). "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikimura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001). Factors that may support a finding of irreparable harm include a threat to the plaintiff's existence, damage to goodwill, loss of customers, or loss of its competitive position in the market. *Dominion Video Satellite, Inc.*, 356 F.3d at 1262.

The Court finds that Plaintiff has not established that it will suffer irreparable harm if its request for a temporary restraining order is denied. Plaintiff relies on the injunctive relief provisions of the RSU Agreements and on Plaintiff's Verified Complaint to establish irreparable injury in this case. Neither basis is sufficient.

With respect to the injunctive relief provisions of the RSU Agreements, Plaintiff argues in a footnote that "Da Silva agreed in the RSU Agreements that TTEC would be entitled to seek temporary or permanent injunctive relief against a breach or threatened breach 'without the necessity of showing any actual damages or that money damages would not afford an adequate remedy.'" (Doc. # 2 at 7 n. 2.) Plaintiff cites to no authority to support its suggestion that the parties may effectively waive a movant's obligation to demonstrate irreparable injury in support of injunctive relief. Nor is the Court aware of any such authority. Indeed, courts have rejected similar attempts by litigants to contract around the required showing for injunctive relief. For example, in *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194 (M.D. Pa. 2001), an employer sought injunctive relief against a former employee to enforce non-compete, non-

solicitation, and confidentiality agreements. The district court rejected the employer's attempt to circumvent a judicial determination of irreparable harm:

> It would represent an extraordinary variance from th[e] basic principle [that a court must consider certain fundamental elements before granting injunctive relief] for a court to recognize that the parties to a suit at equity have contracted around one of these fundamental elements. "It is a basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 499 (1974) and *Younger v. Harris,* 401 U.S. 37, 43–44 (1971)) (internal quotation marks omitted). Therefore, this Court must not interpret § 10 of Norton's Employment Agreement with First Health to waive the required analysis of whether, in fact, Plaintiff has established that it will suffer irreparable harm in the absence of a preliminary injunction.

*Id.* at 235. The Court concludes that the same principles hold true in this case and, therefore, assigns no weight to the injunctive relief provision of the RSU Agreements.

The Court finds that the remainder of Plaintiff's argument concerning irreparable harm is speculative and insufficient. TTEC argues that Da Silva's extensive knowledge of TTEC business dealings and his relationships with TTEC clients, combined with his new role at Five9, creates "a significant risk that Da Silva will use the knowledge and relationships he possesses from his work at TTEC to undermine TTEC Digital's relationships with strategic partners and divert business to TTEC's competitor." (Doc. # 2 at 7.) In support of that assertion, Plaintiff cites only to allegations stating the same in its Verified Complaint. (*Id.*) (citing (Doc. # 1-1 at 5, 9)). The allegation that there is a "significant risk" or a "high probability" that Da Silva will harm TTEC is altogether too vague and speculative to carry TTEC's burden of demonstrating that "irreparable injury . . . will surely result" without the issuance of the requested temporary restraining order.

6

*Schrier v. University of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005). Indeed, granting injunctive relief on such a speculative basis would lead to the imposition of injunctive relief in virtually every non-compete case, making injunctive relief the rule rather than the exception. *See GTE Corp.*, 731 F.2d at 678 (explaining injunctive relief is the "exception rather than the rule."). Therefore, Plaintiff has not carried its burden to demonstrate that it will suffer irreparable harm if its request for a temporary restraining order is denied.

2.  **THE BALANCE OF THE EQUITIES WEIGHS IN DEFENDANT'S FAVOR**

As to the factor that the threatened injury to the movant outweighs the injury to the party opposing injunctive relief, "[t]his factor is simply a comparison between the injury [Plaintiff] would suffer should no [temporary restraining order] enter, . . . versus the injury [Defendant] would suffer if the [temporary restraining order] does enter." *Haggard v. Spine*, No. 09-cv-721, 2009 WL 1655030, *15 (D. Colo. June 12, 2009).

As previously discussed, TTEC has failed to demonstrate any concrete injury that would follow the denial of the requested injunctive relief. The harm alleged in its Motion and Verified Complaint is purely speculative and unsubstantiated. By contrast, Da Silva would be required to leave his employment for a year if the Court grants the requested injunctive relief. That would lead to loss of income and health insurance coverage for his Type-1 Diabetes. Accordingly, the Court finds that the injury to Defendant outweighs the injury to Plaintiff, and the balance of the equities factor weighs strongly in Defendant's favor.

### 3.     PLAINTIFF HAS NOT ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The Court need not address Plaintiff's likelihood of success on the merits because it has concluded that Plaintiff failed to establish two of the necessary factors for injunctive relief, including the most important factor of irreparable injury. Nonetheless, the Court notes that Plaintiff's Motion would also fail on this basis.

Under Colorado law, a non-compete agreement must be reasonable in duration and geographic scope. *See Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006), *as modified on denial of reh'g* (Feb. 15, 2007). Moreover, it "must not be broader than necessary to protect the promisee's legitimate interests, and it must not impose hardship on the promisor." *Id*.[1]

As Defendant argues, Plaintiff seeks to enforce a non-compete agreement that restricts a broad spectrum of activities and is very broad in geographic scope, applying worldwide. Defendant has raised colorable arguments challenging the enforceability of the non-compete agreement based on the geographic scope of Plaintiff's business, as well as the breadth of the non-compete agreement in relation to Plaintiff's legitimate business interests. *See* (Doc. # 12 at 8–12). Moreover, it is manifest from the Verified

---

[1] Defendant notes in his Response that Plaintiff fails to acknowledge in its Motion that Delaware law governs the RSU Agreements pursuant to the Agreements' "Governing Law" provisions. *See* (Doc. # 12 at 8 n. 7) (citing (Doc. # 1-1 at 18, ¶ 12(a))). The Court discusses Colorado law herein because Plaintiff relies on Colorado law in its Motion. However, the Court notes that the general rules concerning reasonableness of non-compete agreements discussed herein are applicable under both Colorado and Delaware law. *See Sensus USA, Inc. v. Franklin*, No. CV 15-742-RGA, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) ("Delaware law recognizes restrictive covenants on employment when such covenants: (i) adhere to general principles of contract, (ii) are reasonable in scope and duration, (iii) advance the legitimate economic interests of the party enforcing the covenant, and (iv) "survive a balance of the equities.").

Complaint, the Motion, the Response, and the Declaration of Maurice Da Silva that there are disputed issues of fact that may affect the enforceability of the non-compete agreement and/or a finding of liability if the non-compete agreement is enforceable. Such issues include:

- whether TTEC and Five9 are in competition;
- whether Da Silva performed services for TTEC in Canada within the meaning of the non-compete agreement;
- whether TTEC benefitted or reasonably expected to benefit from Da Silva's services in Canada within the meaning of the non-compete agreement;
- whether Da Silva's current position at Five9 has any overlap with his previous position at TTEC; and
- whether TTEC belongs to a global competitive market.

Given these disputed issues, the Court cannot find that Plaintiff is substantially likely to succeed on the merits of its breach of contract claim against Defendant.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order (Doc. # 2) is DENIED. Accordingly, the December 17, 2020 hearing on Plaintiff's Motion is hereby VACATED.

DATED:  December 16, 2020

BY THE COURT:

_Christine M Arguello_
CHRISTINE M. ARGUELLO
United States District Judge